With that, I think we're ready to begin with the first case, S.E.C. v. de Maison. Good morning, Your Honors. I'm Jeff Cooper Smith on behalf of Angélique de Maison. I'm pro bono counsel for Ms. de Maison. I'm from the firm Oreck Harrington & Sutcliffe. I have reserved two minutes for rebuttal. May it please the Court, I'd like to talk to you about two issues this morning. One is the amount of the civil penalty imposed by the District Court, and the second issue is the actual disgorgement amount imposed. As the Court knows, this is the second time this case has been up before this Court. First of all, regarding the civil penalty, by statute, 15 United States Code 78U, D, 3, B, three small i's, the amount of disgorgement is limited in this case to the amount or the gross amount of pecuniary gain. In this Court's prior opinion in footnote 2, this Court pointed out that our argument at that point as to the penalty amount, which was originally $4.2 million, this Court said that argument failed for the same reasons that our disgorgement argument failed. Of course, since then, the United States Supreme Court has decided the Lew case, which limits disgorgement to the net profits. There are cases — Are you arguing — excuse me. Are you arguing that the civil penalty is also limited to net profits? No, Your Honor. The civil penalty, by statute, is the gross amount of pecuniary gain. The difference, though, is that in this case — this is not a business expenses case. The Lew case provided that a defendant could deduct legitimate business expenses from the gross amount to get to the net amount. That's not this case. This case involves investors who put in money. That money went to its intended investment except for the amount that is disgorgement, either $524,000 in the SEC's view or $184,000 in our view. That amount of — there's no business expenses. So the gross amount in this case and the net amount for purposes of disgorgement or penalty is the same amount. Well, I'm not sure about that. As I understood the scheme here — and I could be wrong. I wasn't here the last time around, so you'll have to help me perhaps. I thought that what Ms. de Maison had done and what the other conspirators had done was to sell unregistered stock that was essentially valueless to people, and they paid money for that stock. Is that wrong? No, that's not wrong, Your Honor, but the — Well, okay, but maybe — please, I don't want to hear the but. But in that case, isn't all of the money that came in — I mean, if the stock is basically worthless and people paid collectively $4.2 million for it, why isn't $4.2 million the entire gross amount? And then the question is, where did that money go when they paid that money? They got what they thought they were getting in the sense of shares of whatever, but they weren't getting something that was of the value that they were led to believe. Yes, Your Honor. The penalty statute provides that the maximum amount would be the gross pecuniary gain to the defendant. So the investor losses are not the issue. In this case, what happened is, Your Honor is right, the money from investors went to its intended investment. And in most cases, it was a company called Casaflanca Mining. That money went there. Now, it ended up where they lost that money, but that money didn't go to Ms. de Maison. So — But where did it go in the first instance? It went into what the district called the investment entity account, which, as — And didn't — did she not control that account? She did not. That was under de facto control of Mr. Engelbrecht, her abusive husband, and Ms. Malone. And that's undisputed on the record, Your Honor. The case — the accounts were not controlled by her. But some money did end up going to her personal use. But again, there's — see, what I'm — what I thought you were arguing with respect to the disgorgement is that money came into accounts that she controlled, or at least had signature authority over or something, and then some money came out of those accounts and went to either her personal expenses or to accounts that were, in some sense, personal to her, that no other people had access to. I thought that was — and that's what we're trying to figure out is how much of that counts as net profits. But when the money comes in, you're telling me that the $4.2 million — that only some of that money went to accounts that she was able to access? Right, Your Honor. The actual path of the money is investor money goes to an account that's under the de facto control of Mr. Engelbrecht and Ms. Malone. And that's the Bridges account or the Kensington and Royce account. There's an accounting in the — in our briefs on pages 10 through 15. And what happens is then some money from that account that she is not really controlling, although she does have signature authority, but it's undisputed that it was under the de facto control of others, some money from that account goes to her personal account at JPMorgan Chase. That's the money that's at issue under the disgorgement. So the investor money comes into an account. It goes to its intended purpose, which is a mining concern. That money never goes to Mr. Maison. So the disgorgement amount, and the SEC has agreed, that it's limited to what she personally got. But I thought the withdrawals from that account were by — she withdrew the money, so she had some control over the account from which it came. Or am I misunderstanding? Your Honor, there's no — there's nothing in the record that specifies the SEC has not proven that she personally withdrew the money. The money could have been simply sent to her from Mr. Engelbrecht. But more importantly, Your Honor, the issue here is that there's no business expenses here. This is not a case where there's a difference between growth and net because of some legitimate business expenses. The growth and net are the same because she got what she got, which is, in our view, $184,000. Is this an argument that was made in the brief because I did not understand this to be your argument at all? Now, maybe I missed this, but I thought it was a given that what we were arguing about was — principally, on the disgorgement point, which was your first point in the brief — it's been demoted, I guess, now — that we were arguing about whether money that, as I understood it, she withdrew from one account, which was where the proceeds of the sales came in, into uses that were personal to her in some way. And you are arguing about basically tracing. And how could we know that the money that came out of this account in the first place was fraud proceeds rather than other legitimate monies in those accounts that belonged to her? Am I misunderstanding that? Your Honor, I think so. The SEC has conceded in this case that money that went to these accounts that we say were under the de facto control of others, the SEC has conceded that money did not go to Ms. Maysot. They've conceded that for purposes of disgorgement. Yes. Well, for purposes of disgorgement, because I thought that what the whole argument was about on disgorgement was lots of money came in. Then most of that money, your Honor, has gone to or at least has not been proven not to have gone to other people than de Maysot. And only a certain amount found its way into her actual pockets or for her actual use. And we were arguing about that. But I did not think there was a dispute about whether some larger sum of money than the five or the $100,000 that you're arguing about, that some, there's no dispute that some rather larger unspecified amount, maybe all of the $4.2 million, came into some account that she was a, if not the, person with access. Your Honor, there's no dispute in this case that a maximum of $524,000 went to Ms. de Maysot. We say it's $184,000. There's no dispute about that. So the amount that went to Ms. de Maysot is the same whether you count it as gross or net. No other money went to Ms. de Maysot. I, when I say I disagree, I mean at least based on the way I understood the arguments, that wasn't what we were arguing. The five or the one finds its way provably to her pockets. It's sort of like you have a bunch of bank robbers. They rob the bank. They've got a big pile of loot. The gross proceeds of the robbery is however much they got from the bank. But some people only take from that pile when they divide it up more or less. The mastermind gets the most, the getaway driver gets a little, and so on. And disgorgement in the case of the SEC is limited to how much the getaway driver took from the big pile. But if you're looking at what the penalty is, it seems to me it would make sense, whether or not this is the law, that's what we can argue about, but it would make sense to say the gross proceeds of the robbery is what determines how serious the crime is, and therefore what the penalty should be as opposed to the disgorgement. So what am I getting wrong? Your Honor, I see my time's up, but gross pecuniary gain to the defendant is not the total $4.2 million that came in from investors that never went to Ms. de Maysot. It went to its intended purposes. Well, Mr. Kubitschmidt, the SEC in its brief to the district court, granted, only sought $500,000 or so disgorgement here. But they said in their brief that, or they implied in their brief, that they could seek the larger amount, suggesting that perhaps they were able to seek the larger amount on some concerted action. But they weren't seeking that, and I think they implied that because they were getting money from the other defendants in this case. So that leaves the question about whether the pecuniary gain could be considered the $4.2 million here, even though they're only seeking disgorgement at this point for $500,000. Thank you, Your Honor. It cannot. The maximum amount by statute that can be imposed here is the gross amount of pecuniary gain to Ms. de Maysot, which is, in the SEC's view, $524,000. But then that begs the question about whether the prior finding that there was a $4.2 million penalty is the finding that there was a pecuniary gain to Ms. de Maysot of $4.2 million. It is not, Your Honor. And I'll just say, to wrap this up, that the $4.2 million penalty, whatever the law of the statute is, that is a gross abuse of discretion in our view, because all of the factors favor Ms. de Maysot in terms of what happened here. An abusive husband. She's already paid the disgorgement. She cooperated. Co-defendants got a very small amount. Excuse me. On those points, weren't those points considered — they were presented to the prior panel. All of the arguments that you make about discretion, the argument that she has no money, she's an unfortunate person in a variety of ways, one should go easy on her, that was all addressed in the prior appeal. It's in your brief, or whoever's brief. I don't know if you were the lawyer then. It's in the brief. That much I know because I've read it. Yes, Your Honor. No, it is completely different because there's got to be a difference between a defendant before the court who took personally either $184,000 or $524,000 and not $4.2 million. Got to be a difference between that defendant and someone who took the $4.2 million. And the mix of factors before the court is completely different on the remand to the district court. At this point, the culpability has to be less because it is now clear that her gain is only at most $524,000. We say it's $184,000. Okay. And I just have one other question, which is you keep saying that the money went to its intended use as an investment. But I thought you also told — agreed with my characterization that the nature of the scam here was that Ms. de Maison, as well as others apparently, sold worthless stock that had been pumped up artificially in a manipulative scheme so that the money that came in was — it went to its intended use in the sense that the purchaser got however many hundred thousand million shares of a worthless company that they thought they were getting. But that — to say that it went to its intended use strikes me as a little peculiar. It went, at least in the first instance, I should think, into the pocket of the person who sold the worthless stock, who was the previous owner of the worthless stock. Whether that person was a cat's paw for somebody else and handed over all the proceeds to that somebody else is one question. But I thought that everything that came in was basically 100 percent proceeds of a fraud. Am I mistaken? Well, Your Honor, the $4.2 million that comes in, it — when I say it goes to its intended use, all but the amount of disgorgement that's in dispute actually goes to this mining concern and other investments that the investor — I don't know what you mean, but it goes to a And again, maybe I'm wrong, but I haven't heard you dispute this, that when I, as a victim, a hypothetical victim, writes a check, what I am doing is purchasing shares of that company. And ordinarily, if I purchase shares in a private transaction from you, I get the shares, you get the money. It doesn't go into the capital account of the company necessarily. I bought the shares from you. Right. But that's not correct in this case, Your Honor. And the reason is, money — investor pays for shares. That happened. The investor gets shares. And Mr. Mason is, in fact, essentially acting as an agent of some mining concern, but she doesn't get the money. So what happens here — So this is treasury stock of the company, not stock of which she is the registered owner, or I guess it wasn't registered, so I don't know what that means. But I thought the allegation, which was pled to, in effect, in the settlement, was that she and others perhaps sold the stock. But that does not mean that she was the owner of the stock that was sold? Your Honor, it is — you know, we're stuck with the complaint, and it does say that she is selling her shares. But the difference is, there's no difference to the investor whether they get treasury stock or whether they get shares that were, at least by complaint, Mr. Mason's shares. The money goes to the company. The investor gets shares. Mr. Mason doesn't get the proceeds. So it's not pecuniary gain. It's not gross pecuniary gain. It's not net profit. It's not — Who does the check get written to? I mean, when the — if the complaint says, and the complaint is admitted to, if the complaint says she sold the shares, are you saying that we're to take this as she is like the broker, she is the salesperson, she is somebody who convinces you to buy, but she's not the person who owned the shares? Your Honor, it may make a difference to the investor. I want to have, because you've defrauded me into thinking it's a great investment, 100,000 shares of this mining company. But it makes a difference to who is getting the gross proceeds, whether those shares are owned by you or they're owned by him or they're owned by the — they're just being issued by the company as a fresh issue. Your Honor, the checks, as I understand it in the record, were made out to these investment entities that were not disputed under the de facto control of Mr. Engelbrecht. And can you say the de facto control? And I don't understand exactly what that means. If I am acting as a cat's claw for somebody else, but still my role is that the shares are issued to me, the guy who's the real mastermind and the bad guy in this is — has created the scheme to distance himself from it so that I'm the front person and the shares are in my name and I sell them to somebody and the money comes into an access, the fact that I then have to transfer that money, or maybe I never even see it because somebody else has access to the account, drains it and I never see a penny, that may mean that I did not profit myself personally. But I'm having a little trouble understanding — and that clearly goes to whether I had the net proceeds. But if all of the gross proceeds of the before they go to somebody else, I'm not sure why that doesn't — why that isn't a fair measure of the seriousness when it comes time to penalize me, as opposed to when it comes time to have me disgorge my profits. Why the whole thing doesn't — isn't attributable to me. And maybe I'm thinking of this too much through a criminal lens, but that's the way I was understanding the case. Your Honor, nothing except for the disgorgement analysis disputed is pecuniary gain to Mr. Mason. But in addition, Your Honor, I just want to end by saying this is an abused spouse whose life was taken over by her husband. This is all on the record. It's not disputed. Her co-defendant, who the district court said is at the center of Mr. Engelberg's schemes, she got a $125,000 restitution on $300,000 of disgorgement. There is nothing in this case that cries out for a link to disgorgement, as did this court in its footnote. And at this point, justice requires that the disgorgement amount — I'm sorry, the penalty amount be no more than the amount of disgorgement, which under our accounting, which I think is fair, is $184,000. Thank you. May it please the Court, my name is Theodore Wyman and I represent the Securities and Exchange Commission. I'll start where opposing counsel focused in his argument on this notion of gross pecuniary gain somehow not being the $4.2 million that she gained from her illegal stock sales. This argument, of course, I don't — I agree wasn't presented in the most recent briefs, but it was decided in this Court's prior opinion, where this Court recognized that the entire $4.2 million is ill-gotten. It's all tainted funds. That's in the opinion. Because it's the proceeds of her unlawful stock sales and her sales acting as an unregistered broker. I think it's important to recognize, as Your Honor pointed out, that she owned the stock. Is it clear either in that opinion or in the district court opinion that that was specific to her? Because doesn't pecuniary gain have to be defendant-specific, unless it's concerted action, the same as disgorgement? And I'm going back to that opinion and to the prior district court opinions, and I can't find a place where there is a finding that the $4.2 million is specific to her, other than it being tied to disgorgement, and the way disgorgement was measured at that time was not specific. Yes, Your Honor. The key fact there is her ownership of the stock. This wasn't her selling stock that was company stock that she didn't own. She personally owned the stock through her shelf company. So — but that — that may be true, but isn't that an argument for the district court? In what sense, Your Honor? Well, has the district court said what you just said? Absolutely. Absolutely. The stock sales were her proceeds. She — that's the entire registration violation. This was an unregistered offering. She sold her own stocks reaping $4.2 million, and that's inherent in the violation itself. It's allegedly plain. It's a fact in this case that she owned the stock, I believe, through her shelf company. And at the point that she sold the stock, it was — it was her proceeds. But at this point, the SEC in the brief to the district court said, we're going after $500,000. And it says we could go after more, but we're not. So the opinion that we have — the decision that we have in front of us is one where the SEC said, we're going after $500,000. She's on the hook for $500,000 disgorgement. So are we — do we still have some sort of finding that she is liable for a $4.2 million penalty? Yes, Your Honor. That would be the gross pecuniary gain. $4.2 million came in with proceeds of her personal stock sales. And she sold all of them while acting as an unregistered broker. So, you know, and those — those laws exist for a reason. To inform investors, that's what the registration requirement does. It provides them information needed to make their investment. And of course, the expertise of a broker in advising and informing investors. Those investors invested this money, and they lost it because it was a disgorgement. And that's why these registration requirements and broker expertise requirements exist. So all $4.2 million that were the proceeds of her own stock and through a process in which she was acting as an unregistered broker are attributable to her wrongdoing. They are simply the product of her actual violations for which she was held liable. From that $4.2 million, of course, after the Supreme Court's decision in lieu, the Commission endeavored to see how much of it she personally retained. Because a disgorgement serves a different purpose than a civil penalty. A civil penalty is — a disgorgement is intended to return the situation, take away from the wrongdoer their gain. But a civil penalty, which Congress explicitly put in the securities laws, is intended to make violating the laws unprofitable. To — and that's why it looks at the seriousness of the wrong, which is measured by the $4.2 million proceeds of her specific violations. Let me — let me come back to what you're saying here and try to make sure again that I understand it. Whether or not it is the law that she might be also responsible on a concerted action theory for shares that other people sold as part of the same scheme, whether or not that might be the case, you're not relying on that in the argument you're making now. You're saying that she owned shares which were sold to people for $4.2 million. Exactly. There was a lot more money raised in this scheme by other people through other sales. The $4.2 million here were her sales. She made the sales and as an unregistered broker. And they were her shares through her shell company. So the money, at least nominally in some sense, comes to her. And I take it what you're fighting about on the disgorgement front is a much smaller sum. Now, whatever might be true in God's eyes, we can only talk about what is true as far as the record shows and what you've sought. But you have claimed to be able to prove, at least to a reasonable degree of certainty, not necessarily beyond a reasonable doubt, that $500,000 of that money went to her personal use. And that leads us to the argument about how clearly does it have to be traced and things of that sort. They're arguing it's only $100,000. But assuming, and I always thought this was the assumption, that what you can't prove is that of the $4.2 million, or what you haven't tried to prove, is that approximately $3.7 million may have been siphoned off by other people who were lurking behind her as co-conspirators but weren't the front person who sold the stock. Absolutely, Your Honor. And it may be the case. I'm not saying it's so, but it may be the case that on the back end she was taking money from the companies. The fact is the Commission was faced with the record before it. And what it had was bank records. Certainly there wasn't very detailed accounting records that accounted for all this money. What we have is the bank records showing that $4.2 million came in from her violations, from her sales of her own stock, into these accounts that she had control at the point of the sale. I don't agree that it's undisputed that she didn't have de facto control over the account. In other words, the point, or a point, is this is not to be understood as a case, for example, in which a broker persuades a client to buy $4 million worth of stock in the market and puts it into that person's account. And then we look at how much came out of that person's account of the brokerage and was embezzled, in essence, by the broker. That's not this case, where the rest of the money actually did go into the market and resulted in shares of a legitimate stock being purchased. This is a case where every dollar that came in from the sale of stock was the proceeds of fraud. It's the proceeds of her unregistered sales in an unregistered offering and acting as an unregistered broker. It was connected, certainly, to the fraud, but she was specifically liable for the sales in an unregistered offering. But you're absolutely right, and that's what this Court said in its previous decision. All $4.2 million is tainted. This is a case in which it was her stock. Well, it's tainted, but again, the question of taint is still separate somewhat from the standpoint of if all the money was tainted, but $4.2 million each on their own account, it would still be tainted money, but it would never have passed through her control. But if what you're saying is, and I take it as what you are saying, the complaint alleges and the settlement agreed to and the entire case has proceeded on the assumption, as I understood it, that she personally sold $4.2 million worth of her shares of worthless stock that she knew was unregistered and she knew was the price of which had been manipulated. Absolutely. This $4.2 million is the subset that runs through de Maison. There were other sales. There was other money raised by other people involved in the scheme. The $4.2, she is the choke point where this money enters the scheme, essentially. That's what the $4.2 million is, and that's why it's her gross pecuniary gain. And at least what you are agreeing to for purposes of this case at this point is that no more than $500,000 approximately of this can be shown to have actually wound up buying a Maserati for her or paying her credit card bills or going into an account that no one else could touch. Absolutely. That's the amount of money that we can show that she personally retained to a reasonable approximation. It's money that was withdrawn from her. There's no question she took the half a million dollars. And they don't dispute that $185,000 of it she took for her personal gain from investor funds. There's no dispute that she used these accounts. These accounts were used in the fraudulent scheme and in all the wrongdoing. The money was commingled by de Maison, and then it was withdrawn by her. She acknowledges taking $185,000. There's another $80,000 that they don't dispute when we raised in our briefs that they attribute to the co-signatory account. They don't dispute our argument that that's not a legitimate distinction. And am I wrong also that in this civil case, she is someone who would know where the money actually went. If all the money came into this account and most of it went to her husband or most of it went to some other conspirator and did not benefit her, she would be in a position to tell us that. Absolutely. The onus is on de Maison to rebut the commission's reasonable approximation where it showed that investor money was in the account, she withdrew it, and she has offered no explanation, let alone evidence, as to why she took that half a million dollars. And when she commingles the funds and there's no accounting records that, you know, can unravel this mess, the uncertainty under longstanding principles of equity falls on the wrongdoer. Thank you, Your Honor. We'll hear rebuttal. Thank you, Your Honor. What the SEC is claiming here is that money that went to these accounts, and they're called Kensington and Royce and Bridges, that when money goes from those accounts to an investment like Casablanca Mining, that that's an expense that Ms. de Maison is, that's not the case. Yes, it's true that... Why are they saying, I don't see why they're saying that. They're saying it proceeds to her. It got siphoned off or paid by her or allowed by her to be taken by someone else, but it came to her. That's what they're saying. But it didn't, Your Honor. It did not, Your Honor, because those accounts, the Kensington and Royce and Bridges accounts, there's no dispute in the record. We made a showing that those accounts are under the de facto control of Mr. Engelbrecht and Ms. Millen, the abusive husband and his partner. Isn't the point made that she sold 4.2 million of her shares? Why isn't that the end of the inquiry? It's not, Your Honor, because then the money goes into accounts she doesn't control, and the SEC has never disputed that, and then from the accounts she doesn't control. But it was her. She's the first person in that chain, no? She's an abused spouse who doesn't really control these accounts. On paper, she has her name on those accounts. The SEC has never disputed that it's Mr. Engelbrecht and Ms. Millen. Ms. Millen is the one with Mr. Engelbrecht who transfers the money to these mining concerns. How did the money get transferred to her, then? Say it's only $100,000. How did she wind up with that? There are bank records showing that a transfer is made from these accounts that are under the control. And she is a signatory on those accounts. She is. So what are we talking about? You can say that somebody else is the de facto ruler and king of all of this stuff, but the money is in an account that she has some ability to access. And it does get accessed, and it gets accessed for her benefit. So why is it not the case that if she is the person who sells the stock, and the money, and it's stock of hers, the money then comes into an account of which she has signatory authority? And then at least some of that money, mysteriously, finds its way directly to her for something that is indisputably to her benefit. Why is it not the case that she is responsible for the gross proceeds of the fraud, at least for purposes of a penalty? Then when we get to disgorge her, we have a different problem. If somebody else was the mastermind who confiscated most of the money, and she was acting largely as a tool of that person, so be it. She shouldn't be made to disgorge what she never got. This is different than deducting the legitimate expenses. And maybe your argument leads to the conclusion that Lew doesn't really control this case, because this isn't an expenses case. It's really something else. It is something else, Your Honor. It's not a case where it is business expenses. The money never actually goes to Ms. de Maison, regardless of the fact. But it does. It does. Under the fact of this case, it does not. It goes to an account that she controls. I grant you that at least the SEC isn't claiming to be able to prove that she exercised that control. And maybe someone else who also had control of the accounts got most of it. But that seems to me an entirely different question. That's a question about disgorgement. And I think you should be careful saying Lew doesn't control this case, because it's only because of Lew that you're here. Lew controls the disgorgement of that, Your Honor. The point is, though, Your Honor, under the facts of this case, the money is not gross pecuniary gain to Ms. de Maison, when she theoretically, as Your Honor just said, controls the account. And the last thing I want to say is that regardless of all that, because that's the law of gross pecuniary gain, regardless of all that, this is an egregious abuse of discretion. There is no basis for a maximum penalty of $4.2 million on disgorgement of either $184 or $524. There is no case that doesn't apply. Isn't that the thrust of your argument this morning? I'm sorry? Isn't that the thrust of your argument this morning? I mean, ultimately, given that she owned the stock, the money went into the account, you're really saying it was an abuse because of some of the factors that were before us before to impose the civil penalty and the amount that was imposed? Your Honor— Not an error of law, but an abuse of discretion, given all the extenuating factors. I think both are important, Your Honor. There's an error of law on the gross pecuniary gain definition. But in addition, Your Honor is absolutely right. Here, under all the facts which have to be considered anew by the district court when there's a vacation of the entire judgment and there's a disgorgement of a fraction of what it once was, under all those factors the district court should have considered, there is nothing here and no precedent for this type of penalty on a homeless, abused spouse who paid almost all of the disgorgement out of her own pocket. But again, wasn't that argument precisely made to the prior panel, that it was an abuse of discretion? And the panel said no, right? It wasn't an abuse of discretion before. And the answer was no. But the difference, the enormous difference, Your Honor, was we were before the court before with an assumption that she got $4.2 million. No, no, there's a question. It's not clear that she didn't. No, no, I'm sorry, excuse me. You have to distinguish the factual issue from the legal issue, I thought. The factual issue is as it always was, that the $4.2 million was rooted through her. She is the one who sold the stock. It was her stock, et cetera. That's the fact. That hasn't changed. What's changed is that it used to be, or at least we thought it was, or at least the Second Circuit thought it was, that a person in that position could be required to disgorge that much. And indeed, that does seem rather remarkable, especially if you also have to pay a penalty of that much. You know, that's sort of double damages, as it were, of something that you never actually got. Well, fine. But now that's not the case. Now, disgorgement has been hived off and has separate rules. You only have to throw up what you ate. That's what disgorgement means. But the penalty is like going to jail, right? I mean, it's something that you get to punish and to deter. Yes, Your Honor. But when the SEC and the district court agree now, the second time before this court, that she didn't get $4.2 million, the SEC insisted, as did the district court the first time around, that she actually got $4.2 million. That might be worthy of this type of penalty. When it's now clear that she got a fraction of that, which means that she didn't benefit, that's a whole difference in culpability that has to be considered anew. The SEC can really point to no precedent for that type of penalty, and I think it is an abuse of discretion. I think there's really no question about it. Thank you. Thank you both, and we'll take the matter under advisement.